<pre>
 1                    IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF NEW MEXICO

 3    _____
                                     )
 4    UNITED STATES OF AMERICA,      )   No. 1:20-CR-00972-WJ
                                     )
 5            Plaintiff,             )
                                     )   Pete V. Domenici U.S. Courthouse
 6       vs.                         )   Cimarron Courtroom
                                     )   Albuquerque, New Mexico
 7    TRUDY MARTINEZ,                )   Friday, September 10, 2021
                                     )   10:00 A.M.
 8            Defendant.             )
      _____)

 9

10                      TRANSCRIPT OF PROCEEDINGS
                           SENTENCING HEARING
11            BEFORE THE HONORABLE WILLIAM P. JOHNSON
                 CHIEF UNITED STATES DISTRICT JUDGE
12

13    APPEARANCES:

14    For the Plaintiff:   THOMAS ALIBERTI
                           UNITED STATES ATTORNEY'S OFFICE
15                         District of New Mexico
                           Post Office Box 607
16                         Albuquerque, New Mexico    87103

17    For the Defendant:   IRMA RIVAS
                           FEDERAL PUBLIC DEFENDER
18                         District of New Mexico
                           111 Lomas Blvd., NW, Suite 501
19                         Albuquerque, New Mexico  87102

20    For U.S. Probation: JASON HUNT

21    Reported by:         MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
                           United States Court Reporter
22                         Phone:  (505)348-2334
                           Email:  Mary_Loughran@nmd.uscourts.gov
23

24       Proceedings reported by machine shorthand and transcript

25    produced by computer-aided transcription.
</pre>

1                        USA v. Martinez   20-CR-972

2                        Sentencing Hearing

3                             *  *  *  *  *

4    (In Open Court at 10:03 A.M.)

5              THE COURT:  This is United States vs. Trudy Martinez,

6    20-CR-972.  Would counsel enter their appearances for the

7    record, please.

8              MR. ALIBERTI:  Good morning, Your Honor.  Thomas

9    Aliberti on behalf of the United States.

10             MS. RIVAS:  Good morning, Your Honor.  Irma Rivas on

11   behalf of Ms. Martinez, who is present and in custody.

12             THE COURT:  Ms. Rivas, just a couple of -- as a

13   preliminary matter, did you review the Presentence Report with

14   Ms. Martinez?

15             MS. RIVAS:  Yes, I did, Your Honor.  I reviewed both

16   versions with Ms. Martinez.

17             THE COURT:  Okay.  Now, there's some objections to

18   guideline calculations.  In terms of the factual recitations,

19   were there objections to those, as well?

20             MS. RIVAS:  No, Your Honor.

21             THE COURT:  Okay.  All right, let me begin, then,

22   with the United States.  I've reviewed your sentencing

23   memorandum, but for the record, the Probation Office calculated

24   the Offense Level at 28, the Criminal History Category to be 2,

25   and the guideline range is 87 to 108 months.  And then as to

1  Count 2, the guideline sentence is the statutorily required

2  sentence of 120 months, because that involved the use of a

3  firearm during and in relation to a crime of violence.  And by

4  statute, the 120 months has to run consecutive to the sentence

5  imposed on the other count.  So therefore, the guideline range

6  becomes 207 to 228 months.  Is the United States' position

7  consistent with the recommendation of the Probation Office?

8          MR. ALIBERTI:  That is correct.

9          THE COURT:  Okay.  Ms. Rivas, do you want to proceed

10  first with your objection on the -- I believe it's a two-level

11  enhancement for obstruction of justice?

12          MS. RIVAS:  Yes, Your Honor.  Would the Court like me

13  to use the podium, or may I --

14          THE COURT:  Well, you can either use the podium or

15  remain at table, but if you remain at table, you need to be in

16  front of the microphone.

17          MS. RIVAS:  I'll do that, then.

18          Your Honor, regarding the obstruction charge, we'd

19  ask the Court to look at the facts of the case and see that the

20  Government has failed to establish both that her conduct was

21  willful and that it had any material effect upon her finding of

22  guilt.  Your Honor, regarding the willful, looking at the -- I

23  understand this is an enhancement and not a charge, but looking

24  at the Tenth Circuit instructions, we see that willfulness

25  imposes on the Government a burden of establishing that

1    Ms. Martinez would have some knowledge that her conduct was

2    unlawful or that she had a precise legal duty not to act in

3    that way.  We ask the Court consider that when considering

4    whether her action was unlawful.  There are many other

5    explanations.

6            One important thing, Your Honor, is that this weapon

7    was found merely a quarter mile from the house.  She didn't

8    take it with her.  She didn't destroy it.  Leaving it only a

9    quarter mile from the home, Your Honor, made it pretty easy to

10   find, which is exactly what happened in this case.  The evening

11   that the FBI agents came to the home where this took place,

12   they found it immediately and took pictures of it.  As the

13   Court can see from the Government's sentencing memorandum,

14   those pictures show that the rifle was in a shallow river very

15   near the house.

16           Considering that there were other people in the

17   vicinity, many of those children, it also makes sense that the

18   removal of the magazine and the hiding of the weapon was for

19   the purpose of safety, to prevent either some of the minors

20   from finding the weapon and firing it, or considering the

21   difficult -- the angry situation before the event and the anger

22   that most likely resulted after the event, to prevent anyone

23   from using that rifle.

24           Your Honor, we also ask the Court consider that the

25   rifle was not material to finding Ms. Martinez guilty.  There

1   are several items of evidence that would have been produced had

2   this case gone to trial, and those items of evidence would have

3   established her guilt without the weapon.  One of those items

4   is an interview with the daughter of the victim, and that

5   person, in her interview, describes both that she saw Trudy

6   fire the weapon and, two, described the weapon as a black AR-15

7   and that the rifle looked exactly like the ones the officers

8   were carrying at the scene.

9          We also ask the Court consider that regarding

10  materiality, there was an utterance by the victim before her

11  death.  Ms. Martinez's cousin, Emily Tsosie, was also

12  interviewed after the incident, and in that interview -- she

13  lived near the home.  She ran over to the home immediately

14  after and saw Ms. McCabe -- I apologize; saw the victim in the

15  bed, and the victim said to her, "Trudy shot me."

16         Your Honor, there's also an OMI report that

17  specifically states, without having possession of the weapon,

18  that the victim died as a result of a gunshot wound to the

19  abdomen.

20         So Your Honor, for those two reasons we ask that the

21  Court find that the gun was neither -- that the placing of the

22  gun in the dry river was neither -- there's neither evidence to

23  show that she willfully did it to obstruct the investigation in

24  this case and, two, that it was not material to the finding of

25  her guilt.

1          THE COURT:  Okay.  The United States may respond.

2          MR. ALIBERTI:  Thank you, Your Honor.  I just want to

3   make sure, Your Honor, that we're all talking about the same

4   standard here, and the appropriate standard that applies in

5   this case when determining whether an enhancement for

6   obstruction of justice applies.

7          The authority that was provided in the objection by

8   the defense frankly, from the Government's point of view,

9   actually supports the Government's argument.  What each of

10  those opinions are discussing are the situation where an

11  individual is obstructing justice at the time of arrest, or

12  contemporaneous with arrest.  Why is that important?  That is

13  important because a different standard applies in order to get

14  the exception and, basically, be absolved from an obstruction

15  of justice enhancement.

16         Both of those cases refer to both an action that has

17  to take place -- an obstruction that has to take place at the

18  time of arrest, and then also, if that is the case, the burden

19  is then on the Government to prove what's called a material

20  hindrance to the prosecution of the case.  And that makes

21  sense, because in that scenario somebody is acting reflexively.

22  They try to swallow something, and then the Government has to

23  prove that, hey, if it happened reflexively at the time of

24  arrest, then you have to prove that there was a material

25  hinderance to the case.  That makes sense.

1          That's not what we're talking about in this scenario

2    at all, and therefore, the standard materiality is different.

3    It is, as the case law cited by the defense says, conspicuously

4    low.  Materiality is conspicuously low.  So I think it's

5    important to walk through the enhancement first and then talk

6    about the facts.  The enhancement, as it's supposed to be

7    applied in this case, and the facts that prove it.

8          A two-level sentencing enhancement applies if the

9    defendant willfully obstructed, impeded, or attempted to

10   obstruct or impede the administration of justice with respect

11   to an investigation, prosecution or sentencing of the instant

12   offense of conviction, and the obstructive conduct has to

13   relate to the offense of conviction.  Easy.  The obstructive

14   conduct that occurred prior to the start of the

15   investigation -- which is what happened here; not

16   contemporaneous with arrest, prior to the start of the

17   investigation -- has to be purposefully calculated and likely,

18   likely to thwart the investigation or prosecution of the

19   offense of conviction.

20         Obstructive conduct includes destroying or concealing

21   evidence that is material to the official investigation.  So

22   materiality as it's supposed to be applied to a situation where

23   the obstruction occurs before there is any sort of arrest,

24   contemporaneous to arrest.  Materiality is evidence, fact,

25   statement, or information that it believes would tend to

1   influence or affect the issue under determination.  Tend.  That

2   is why it's called conspicuously low.  It is not a certainty,

3   it is not something you look back in hindsight and decide,

4   well, did it materially hinder the investigation or prosecution

5   in this case.  The question is whether it would tend to.

6   That's it.  So with that in mind, the case law says it's

7   conspicuously low.

8        And frankly, the Bedford case, I think, makes this

9   distinction wonderfully.  It says, hey, this case involved

10  drugs, and law enforcement were trying to conduct an

11  investigation involving drugs.  A prosecutor was evaluating

12  whether to charge the defendant with a drug crime.  So yeah,

13  drugs are self-evident.  The materiality is self-evident to

14  that type of a case.

15        Hiding the murder weapon in a murder case is likely

16  to thwart the investigation.  This is precisely why

17  Ms. Martinez attempted to hide the firearm.  No evidence in the

18  PSR, or in that lengthy self-serving statement that she gave to

19  the forensic evaluator, states anything about doing it for

20  safety.  I think it's easy to infer that removal of the clip,

21  in addition to hiding the firearm -- which you can see from the

22  photographs, Your Honor, was not just thrown as she was running

23  away.  It was wrapped in a towel.  It was hidden in the arroyo,

24  covered by rocks, covered by dirt.  This was conscious,

25  deliberate, willful action on her part.  And then the clip goes

1  with her.  That's willful obstruction that would tend to

2  influence or affect the issue under determination.

3          And there's some other things about this case that I

4  think highlight the importance of this evidence and go above

5  and beyond whether it would tend to influence or affect any

6  issue under determination.  Ms. Martinez was going to obviously

7  argue some sort of justification defense, based on the

8  statements given by witnesses.  The witnesses I would have in

9  this case are, 1), one child witness, Cordelia Martin, that

10  witnessed what took place.  Now, you don't see Ms. Martinez in

11  the courtroom today, despite the fact that she was invited.

12  Ms. Martinez is having a very difficult time even speaking

13  about what took place that day.  The statement, the dying

14  declaration, would rely on the Judge's determination that

15  that's admissible.

16          Frankly, I think even without a justification

17  defense, the hiding of the firearm as you're fleeing the scene

18  and then on the run for a week is tantamount to a confession.

19  And if you recall, Your Honor, Ms. Martinez did not even make a

20  statement to police at the time.  All of these facts point to

21  the materiality and issue.  It doesn't have to be the ultimate,

22  penultimate decision in the case.  It's incredibly broad and

23  clearly completes the inferential chain between her, the crime

24  that was committed -- her and the crime that was committed.

25          I think it's intimately intertwined with essential

1  elements that the United States would have to prove, and I
2  think it's hubris to sit here and say that, well, you can rely
3  on child witnesses, you can rely on an evidentiary
4  determination later on down the road, that's going to prove
5  your case beyond a reasonable doubt.  And as I stated before,
6  that's not even the burden.  It's whether it actually tends to
7  influence an element.  That's it.  Or an issue to be
8  determined.  That's it.

9         The issue in this case I think it most directly goes
10 to is guilt, and consciousness of guilt.  So hiding the firearm
11 is consciousness of guilt.  It's a lack of justification.  It's
12 an issue that would have been litigated at trial, and
13 therefore, it's material.  The fact that she was not successful
14 in her attempt to conceal the evidence, or even that the
15 concealment was destined to fail, which is a large part of the
16 argument of the defense, is irrelevant, and that's cited to in
17 their own case law that they provide to Your Honor, in Bedford.
18 It's irrelevant.  And Massey, actually.  It means nothing.

19        And that makes sense.  You don't just get to sidestep
20 an enhancement by saying, well, it didn't really result in
21 anything, any -- it wasn't really successful in the
22 concealment.  That doesn't make sense.  I mean, that would
23 eliminate a large swath of defendants from obtaining this
24 enhancement, and I don't think that's what the sentencing
25 guidelines intend.

1          If Your Honor has any questions, I'm happy to answer

2   them.

3          THE COURT:  No.  Ms. Rivas, since you filed the

4   objection, do you have anything in addition you want to say in

5   response to the Government's argument?

6          MS. RIVAS:  Yes, Your Honor, briefly.  We would just

7   again reiterate what we wrote in our objection.  I think that

8   in those two cases, those two items of evidence were material

9   because, in the first case, without having -- had the Coast

10  Guard not known that the boat had been boarded, that slip of

11  paper would have been material to its investigation.  Whether

12  or not it was is quite different than our situation.

13  Similarly, how can a person be charged with possession of

14  cocaine with intent to distribute if the authorities are not

15  even aware that there is cocaine and also cannot possibly weigh

16  it.  In this situation, Your Honor, for the reasons that we

17  gave, the rifle in this case was not material.

18          Further, the Government did not need to tie the

19  weapon to Ms. Martinez, even after it found it.  There was no

20  DNA or fingerprints ran on that gun.  Factually -- and I think

21  the Government cannot dispute this -- Ms. Martinez was leaving

22  the location of this incident with her three minor daughters,

23  and her only real way of trying to get her daughters to safety

24  and away from the scene was to possibly hitchhike, and having

25  her three minor daughters with a rifle in her bag would have

1   made it incredibly difficult to do that.

2           And lastly, Your Honor, I just want to comment that

3   it's inappropriate for the Government to comment on

4   Ms. Martinez's right to remain silent at the time of her

5   arrest.

6           THE COURT:  All right.  Regarding the two-level

7   enhancement that the Probation Office applied pursuant to

8   Sentencing Guideline §3C1.1, that provision of the guidelines

9   essentially states that a two-level sentencing enhancement

10  applies:  "If (1) the defendant willfully obstructed or

11  impeded, or attempted to obstruct or impede, the administration

12  of justice with respect to the investigation, prosecution, or

13  sentencing of the instant offense of conviction, and (2) the

14  obstructive conduct related to (A) the defendant's offense of

15  conviction and any relevant conduct; or (B) a closely related

16  offense."  The obstructive conduct related to the offense of

17  conviction, and in terms of the first part about the

18  obstruction or attempt to impede, the key word there is

19  investigation, because that's what was happening at the time

20  this rifle was discovered.

21          Now, according to the application note, "Obstructive

22  conduct that occurred prior to the start of the investigation

23  of the instant offense of conviction may be covered by this

24  guideline if the conduct was purposefully calculated, and

25  likely, to thwart the investigation or prosecution of the

1    offense of conviction."  And I agree with the United States

2    that the enhancement contemplates that obstructive conduct can

3    vary widely in the nature and degree of planning and

4    seriousness.

5          And then in Application Note 3 of the guideline, it

6    gives examples of conduct, including destroying or concealing

7    evidence that is material to an official investigation.  And

8    then material evidence is defined as:  "Evidence, fact,

9    statement, or information that, if believed, would tend" -- and

10   the key word there is tend -- "to influence or affect the issue

11   under determination."  And that's Application Note 6.

12         Now, in terms of material, I've never seen, in terms

13   of cases that go to trial where it's a homicide or some kind of

14   a case where someone died from a gunshot wound, where the

15   United States at the time of trial would not introduce into

16   evidence, you know, the weapon that is recovered and believed

17   to have been used in the commission of the crime, and there's

18   no doubt in my mind that if this case was going to go to jury

19   trial, the United States would take the weapon, if it was

20   recovered, that the United States believed was used in the

21   commission of the crime and send the weapon to the FBI Crime

22   Lab to see if there's fingerprints, and also, if there was a

23   bullet that was recovered from the deceased victim, to

24   determine through ballistics analysis if the weapon that the

25   FBI or the Government suspected was used in the homicide

1   matched the markings on the bullet that was recovered from the

2   deceased victim or recovered from the crime scene.

3          So the defendant and defense counsel don't get to

4   determine the evidence that the Government is going to use at

5   trial, and so this weapon was material in that it meets the

6   definition of material evidence in that it would tend to

7   influence or affect the issue under determination; more

8   specifically, that this was the weapon that was used at the

9   time the victim was killed by the gunshot wound to her abdomen.

10          Now, the record before me shows that Ms. Martinez

11   secreted or hid the weapon by placing the assault rifle

12   approximately a quarter of a mile from the scene of the crime,

13   and the weapon, the AR-15, was wrapped in a towel and put in

14   an arroyo between stones and dirt that covered the firearm.

15   You can see that from the exhibits that are attached to

16   Document 52.  That is the Government's sentencing memorandum.

17   And so in my view, it follows that purposefully hiding or

18   attempting to hide the murder weapon in a homicide case before

19   the investigation begins is likely to thwart the investigation,

20   and therefore, I will find that Probation correctly applied the

21   two-level obstruction of justice enhancement, and I will

22   overrule the Defendant's objection to that enhancement.

23          Were there any other objections to the guideline

24   calculations besides that two-level enhancement?

25          MS. RIVAS:  No, Your Honor.

1          THE COURT:  All right.  Now, the United States

2    Supreme Court has stated that the starting point in federal

3    sentencing is for the sentencing court to arrive at a correctly

4    calculated guideline sentence.  Therefore, I will find that the

5    Defendant's correctly calculated guideline sentence in this

6    case is a guideline range of 207 to 228 months.  That's based

7    on Count 2 of 120 months consecutive to Count 1, and the range

8    on Count 1 -- let me ask the Probation Officer, I'm looking for

9    it in the Presentence Report.  What paragraph is it?

10          MR. HUNT:  It's 94, Your Honor.

11          THE COURT:  Thank you.  So the total Offense Level is

12   28, the Criminal History Category is II, the guideline range is

13   87 to 108 months with respect to Count 1, and Count 2 requires

14   a minimum 120 month consecutive sentence.  So the guideline

15   range is 207 to 228 months.

16          Let me inquire of the United States, in terms of a

17   sentence that is sufficient, but not greater than necessary to

18   satisfy the goals of sentencing, do you have further argument

19   you wish to state on the appropriate sentence in this matter?

20          MR. ALIBERTI:  Your Honor has my sentencing

21   memorandum where I outline why the United States believes that

22   this is a distinguishable voluntary manslaughter from others,

23   and I do address some of the sentencing factors.  What I'd like

24   to do is make a couple of additional points having to do with

25   the nature and circumstances of the offense, the history and

1  characteristics of the Defendant, and also talk a little bit

2  about victim impact, which is also outlined in the sentencing

3  memorandum.

4          But with respect to nature and circumstances of the

5  offense, as I stated in my sentencing memorandum, this offense

6  occurred, was either seen or heard by multiple, maybe upwards

7  of eight children ranging in age from maybe three up to

8  fifteen, three of which saw their mother after she -- either

9  saw their mother get shot, or saw their mother directly after

10  the offense was committed.  Obviously in the submissions of

11  transcripts of the interviews immediately after this took

12  place, these children were experiencing trauma, anger, grief,

13  and obviously at that point they hadn't fully processed it.

14  And that continues to be ongoing.

15          Adverse childhood experiences and potentially

16  traumatic events in childhood can reverberate in a child's life

17  throughout their life.  Some of the consequences include

18  unstable relationships, drug abuse, negative effects on their

19  health and other opportunities.  And so I think it's worth

20  mentioning that this crime did not just take a life, not just

21  one, it impacted nearly a dozen more.  That's why I think it's

22  distinguishable.  Some of those comments that I supplied in the

23  transcript I think are haunting.

24          I also think it's important to talk a little bit

25  about the moments after Cornelia McCabe was shot and her

1  daughter, who was I believe 13 at the time, rushed to her

2  assistance and the Defendant pointed the firearm at her.  Now,

3  her brother who was behind her, aged I believe it was 16 at the

4  time, thought for sure that she was also going to be a victim

5  of Ms. Martinez's.  I think that that is distinguishable.

6  Ms. Martinez did not call for help.  She did not let anybody

7  assist.  In fact, she threatened their lives, as well.

8       I also think -- I've heard this case described as a

9  tragedy, which is an event resulting in great suffering, and

10  the first example in the definition of tragedy is equating it

11  to a serious accident.  I just want this Court to acknowledge

12  that there was nothing accidental about this.  She has pled to

13  intentionally causing Cornelia McCabe's death, and I think that

14  that intent and self-interest is a ligature that ties together

15  all of her actions during the course of this case.

16       She was angry because folks weren't helping her clean

17  up, and she was concerned about Child Protective Services.  She

18  was the one who started the physical altercation.  She told

19  everyone to leave the house, because the house was hers.  She

20  made the decision to obtain the firearm, the decision to obtain

21  the clip.  The firearm was then loaded.  She shot not once, but

22  twice.  She didn't call for help, as I mentioned.  She remained

23  at large, putting her children in harm's way, to avoid

24  prosecution and being held responsible, in her own

25  self-interest.  And she had a birthday party for one of her

1  children in the park where family members called law

2  enforcement to come and get her while she was at large, in her

3  own self-interest.

4         The killing of this victim was unjustified.  It was

5  unprovoked.  She did not have a weapon.  If you do rely in any

6  way, shape or form on this self-serving recitation that's in

7  that evaluation, it sounds like the victim in this case was

8  actually trying to help Ms. Martinez.

9         If we look at her history and characteristics, she is

10  not a youthful offender.  This is not her first time making law

11  enforcement contact.  I do think it's important for the Court

12  to look at her ongoing criminal behavior while in custody.  I

13  also think -- not only in a fight in I believe it was 2019,

14  late 2019, but also in this most recent incident where she

15  obtained a screwdriver from a maintenance man.  I've heard and

16  received some information from defense counsel that they will

17  likely argue that she was off her medication, but Your Honor

18  should take into consideration the circumstances of that

19  offense.  She worked in concert with several other inmates to

20  obtain that screwdriver.  One blocked the camera, another

21  assisted in her opening it.  She secreted it in her cell.  All

22  of which, I think, is worth taking into consideration when you

23  read her letter and she states that she has changed.

24         I do want to talk briefly about victim impact.  The

25  victims are not here.  You've read the statement by Gerard in

1  the sentencing memorandum.  There are some overarching themes

2  in my communication with them, including a tremendous sense of

3  loss, grief, suffering, a sense of betrayal, and also a strong,

4  full-throated desire for accountability.  I put in my

5  opposition to the Motion to Continue this sentencing hearing

6  back in July of 2020 a statement about how she would not be,

7  the victim would not be present for the children's graduations

8  and other important moments in their lives, and that's not

9  hyperbole, that comes directly from the lips of one of the

10 victims in this case.  He saw his mother as his counselor.  It

11 was who he would go to when he needed advice, and she is not

12 there.

13         Ms. Cordelia, who is 15 now, I asked her if she could

14 tell me about her mother so I could tell the Court a little bit

15 about her mother, and we sat in silence, because she couldn't

16 say anything about what took place, her feelings about it,

17 still years later, all of which I think distinguishes this and

18 warrants a sentence at the higher end of the presumptive

19 sentencing range.  Thank you, Your Honor.

20         THE COURT:  Ms. Rivas.

21         MS. RIVAS:  Thank you, Your Honor.

22         Your Honor, may we approach the podium?

23         THE COURT:  Certainly.

24         MS. RIVAS:  Thank you.

25         Your Honor, I did hear what the Government had to

1   say.  In the bit of time that I've represented Native

2   Americans, it seems that Ms. Martinez is also a victim of all

3   these crimes of violence against her, as we indicated in our

4   sentencing memorandum, and all the results that the Government

5   explained -- unstable relationships, health, drug use --

6   unfortunately have affected Ms. Martinez.

7            We submitted a picture of the small home that the

8   eleven people lived in.  They'd been living there for some

9   time, approximately -- that's the home she grew up in.  She'd

10  been living there approximately four years.  Her mother died

11  approximately two years before the date of this incident.  Her

12  mom had been a mediator between all of the siblings and the

13  children, as the matriarch of the family, and when she passed

14  away, there was disorder in the home.  There was constant

15  arguing between the adults, understandably, given the small

16  space that eleven people lived in.  Considering that the eight

17  children, as children will do, argued, misbehaved, that caused

18  tension between the adults, of course, with each parent taking

19  their own sides regarding them and leading to disagreements.

20           Also a source of stress between the adults was a lack

21  of money to provide for these children.  I think not that it

22  justifies what happened here, but both adults had some fault in

23  that regard.  Ms. Martinez admits that her inability to have

24  money to provide sufficiently for her children had a lot to do

25  with her use of methamphetamine and alcohol, and that, of

1    course, ripples and causes her to not be able to work, and not

2    being able to work causes her not to have a vehicle and so on.

3    Her brother, who she is the most close to, and the victim in

4    this case also spent time and money at the casinos in the

5    evenings, which also created some tension and some issues

6    between them.  Unfortunately, this culminated here.

7             On this day, Ms. Martinez had been trying to stay off

8    of methamphetamine and was off of it for two days.  As the

9    Court may know, methamphetamine is probably one of the more

10   nasty of all the drugs and affects a person's decision-making.

11   In her attempt to be free from methamphetamine, she did consume

12   a large quantity of alcohol.  Her daughters had just been

13   returned to her from Navajo Social Services, and they had

14   indicated that they may come by on a surprise visit to inspect

15   the home and take a look at the kids.

16            Your Honor, what she was trying so desperately to do

17   in her very, perhaps not thought-out way, was to keep her

18   children, to keep the family together, and what happened

19   instead was that her actions did blow up a bomb into her

20   family.  As the Court can see, she was hoping that she would

21   have some family support.  She does have a niece, Christina,

22   here.  None of her brothers and sisters are here.  She suffers

23   the pain of that.  She will always suffer the pain of that.

24            As the Court saw from our sentencing memorandum and

25   from Dr. Johnson's report, despite the fact that I've met

1  oftentimes with Ms. Martinez, oftentimes our meetings are not

2  productive because she's just so overwhelmed with her actions,

3  and wishes, as the Court can see from the letters that she

4  wrote to the Court, she wishes that she could take back time.

5          She is eager to make amends.  She has never received

6  any -- she has not received proper parenting classes, drug

7  treatment.  She has not finished her high school.  And of

8  course, part of that is her own doing, but she is ready to do

9  that.  She wants to make amends.  She was hoping that her

10  brother, the husband of the victim in this case, would be here

11  and that the Court would allow her to read the letter that we

12  included to the Court in the sentencing memorandum.

13          THE COURT:  If the United States determines it's

14  appropriate to forward the letter to the victim's significant

15  other, then you are free to do so.

16          MR. ALIBERTI:  Certainly we'll ask them if they are

17  willing to accept the letter.

18          MS. RIVAS:  Your Honor, she's hoping to make amends

19  with all of her family, most importantly her daughters.  She is

20  having a difficult time with everyone, but most importantly her

21  daughters.  Her daughters are rightfully angry with her for

22  what happened here, and that's very painful to her.  It's

23  difficult to try to make a repair in those relationships, to

24  try to come back into the fold of the family with her in

25  custody.

1    Your Honor, I did want to discuss a few of the

2    factors that the Court is to consider.  One is, of course, that

3    in her effort to try to keep her family together, her actions

4    caused her family to fall apart.  Secondly, Your Honor, we ask

5    that the Court consider, in regard to deterrence, she doesn't

6    have any history of crimes of beating people up or shooting

7    people.  Regarding that issue, I don't -- for lack of a better

8    term, Ms. Martinez is not a repeat offender for assaults or for

9    murder charges.  She is eager to begin her treatment.  She is

10    eager to address the poor choices she's made.

11    I also want to address the case that the Government

12    cited regarding the need for the sentence imposed to promote

13    respect for the law, just punishment, adequate deterrence.  The

14    Government cites Bryant, and I ask the Court to consider that

15    Bryant is completely different from the situation in our case.

16    Bryant discusses crimes against Native women in the context of

17    repeat domestic violence perpetrators and why the repeat

18    domestic violence offense was added under 18 U.S.C. 117(a).

19    Ms. Martinez is not a domestic violence offender, and

20    definitely not a repeat domestic violence offender.

21    In the sentencing memo at Page 8, and in the case at

22    Page 1959, the Government cites that Bryant indicates that

23    American Indian and Alaska Native women experience "certain

24    violent crimes" at two-and-a-half times the national average.

25    Those certain violent crimes are rape and sexual assault, Your

1   Honor.  That is not a situation that applies to Ms. Martinez.

2          And regarding the statistic from Dr. Andre Rosay

3   regarding domestic violence, I believe that at Page 14 is what

4   the Government is referring to, that more than four in five

5   American Indian and Alaska Native women, that's 84.3 percent,

6   have experienced violence in their lifetime, and those

7   particular acts of violence refer to sexual violence, physical

8   violence by an intimate partner, stalking, and psychological

9   aggression by an intimate partner.  Again, Your Honor, that is

10  not a situation that applies to Ms. Martinez, and so we would

11  ask the Court to disregard those figures as they do not apply

12  to her.

13         Your Honor, regarding her treatment, given the

14  charge, we do believe that it may be possible that she may not

15  qualify for the RDAP program, but if allowed, she'd like to

16  enter and complete it.  She has proven use of alcohol at the

17  time of the offense, and methamphetamine use just two days

18  before her arrest -- before the date of this incident.  We've

19  looked at certain facilities.  Most of these facilities are low

20  security levels.  I do believe that she may qualify for those

21  facilities upon completion of her GED.

22         Principally, Your Honor, we'd ask the Court to

23  recommend Bryan, which is in Houston.  Although that is far, it

24  does seem to have a lot of the things that she is needing and

25  requesting in order to get back on her feet.  Of course, the

1  GED program; it has a one-year certificate in accounting, which

2  is something she's interested in and wants to pursue; it has

3  therapy and psycho-educational groups; RDAP and nonRDAP

4  treatment; parenting classes; and psychologists available.

5  We'd also ask a recommendation to Carswell, and lastly, she

6  wanted a recommendation to Dublin.

7          THE COURT:  So the first would be Bryan?

8          MS. RIVAS:  Yes, Your Honor.

9          THE COURT:  Second, Carswell?

10         MS. RIVAS:  Yes, Your Honor.

11         THE COURT:  And the third was what?

12         MS. RIVAS:  Dublin, Your Honor.

13         THE COURT:  Okay.

14         MS. RIVAS:  And Your Honor, we do also want to

15 address briefly the incidents that took place at the

16 facilities.  Regarding -- and we didn't file a formal

17 objection.  Those things did happen.

18         The first incident we want to clarify was not -- I

19 believe somewhere it mentions that it was eight people.  It was

20 not eight people, it was her and one other person.  She was not

21 yet taking her psych medications in August, and we do have

22 those medical records if the Court would like to review them.

23 Regarding the incident here in August, through no fault of her

24 own, she had stopped receiving her psych medications.

25         She also accepted responsibility and accepted

1  punishment.  She has been in the SHU, Your Honor, and that

2  punishment is particularly difficult considering it's the month

3  before she appears before Your Honor for sentencing.  It's been

4  a month where she's been alone with her own thoughts, you know,

5  thinking about this and thinking about the Court's decision in

6  her case.

7          THE COURT:  Regarding that incident, certainly it's

8  within the Government's prerogative to raise it, and certainly

9  within your prerogative to address it.  But in terms of the

10 sentencing that I'm going to impose, I'm not going to rely on

11 it or consider it one way or the other.

12         MS. RIVAS:  Thank you.  And if I could have a moment.

13         Your Honor, I have nothing else to add.

14         THE COURT:  Did Ms. Martinez wish to make a

15 statement?

16         THE DEFENDANT:  I'd just like to read my letter, Your

17 Honor.

18         THE COURT:  Certainly.

19         THE DEFENDANT:  Honorable Judge Johnson.  I am

20 standing here today thanking you for letting me speak on my

21 behalf.  I want to let the courts and my family know how deeply

22 sorry I am for the pain and sorrow that I have caused everyone.

23 There is nothing that I can say that will bring my

24 sister-in-law back, but I am standing before you today to

25 accept my punishment for my actions.  I didn't want this to

1   happen, but unfortunately it did, and because I chose to use

2   drugs and alcohol, a life was taken.  If I would have made

3   better choices, she would still be here.  I am truly sorry for

4   what I have done.  I am not asking for forgiveness or sympathy,

5   I am just asking for mercy, Your Honor.

6            I am taking this time I receive to benefit and to

7   change my life, Your Honor.  I hope that you will consider a

8   drug rehab program for my addiction.  I have struggled with

9   this my whole life, and I am asking for help today.  I would

10  like to further my education and to improve my parenting

11  skills.  I am interested in helping other people who are

12  struggling with addiction, as well.

13           I am standing here today as a changed person.  I want

14  to prove to my family, to the probation, and to the courts that

15  if given a second chance, I will put in the effort to change my

16  life and do better.  I am sorry from the bottom of my heart for

17  what I have done.

18           Your Honor, growing up with alcohol in the house was

19  a big influence on my childhood.  As a child, I lived from

20  house to house due to my mother's alcoholism.  It led me to

21  being sexually molested at the age of six years old.  After

22  that, I wasn't the same happy child I once was.  It affected me

23  physically and mentally.  At the age of 13, I finally stepped

24  up for myself and told my counselor about what was happening to

25  me at home.  I started to struggle with mental abuse, because I

1   was suicidal.  I attempted suicide multiple times, and I

2   started going to counseling for both.  It wasn't helping me, so

3   I started to drink at the age of 15 and was kicked out of

4   school for my marijuana problem.  I found myself staying under

5   the influence of drugs to cope with my issues, to numb my pain

6   and the thoughts of what I went through as a child.  I was

7   never able to express myself through anyone.

8           After I had left school, I never graduated, and ended

9   up pregnant at the age of 17.  I have three beautiful children

10  that I do not regret.  They are my everything.  I did my best

11  to raise them.  I am not perfect, but I tried.  I struggled

12  with addiction because of my childhood and because of my

13  ex-boyfriend of two years who shot and beat me.  I tried to go

14  to rehab for meth addiction soon after, but I never

15  successfully completed it.  I do plan on getting treatment and

16  taking parenting classes that will be available to me while I

17  am incarcerated.

18          I see myself completing my high school diploma and

19  going to college for my associate's degree for accounting.  I

20  am also interested in taking psychology courses to maintain a

21  degree so I can help others that are in the same situation as

22  me.  This incident that occurred on April 26, 2019, could have

23  been prevented, but it took place, and now all I can do is the

24  right thing by accepting my punishment.  It hurts me to know

25  that it took place in front of the kids.

1    Your Honor, I am a single parent and I am all my

2    children have.  Please, Your Honor, I am asking you to have

3    mercy on me and give me another chance to be with my babies and

4    my nieces and nephews, another chance to help my brother with

5    everything he is struggling with because of me.  I did not mean

6    for this to happen, Your Honor.  I need to prove this to the

7    courts and my family by completing everything that is ordered

8    of me today.  Thank you for giving me a chance to speak to you

9    and my family today.  Thank you, Your Honor.

10    THE COURT:  Thank you.

11    Anything else, Ms. Rivas?

12    MS. RIVAS:  No, Your Honor.

13    THE COURT:  I'll formally accept the plea agreement

14    in this case.  Having ruled on the objections to the guideline

15    calculations, I'll adopt the Presentence Report's factual

16    findings.  I've determined and made findings on the guideline

17    sentencing range.  That is, it would be an Offense Level 28,

18    Criminal History Category II, which is 87 to 108 months on

19    Count 1, and then Count 2, the guideline sentence is a

20    statutorily required sentence of 120 months, which must by

21    statute run consecutive to any sentence imposed in Count 1.

22    Therefore, the total guideline sentencing range is 207 to 228

23    months.

24    Now, in terms of recommendations to the Bureau of

25    Prisons, I recommend that the Defendant, if she's eligible,

1  that she be designated first to the Bryan, Texas, facility.  If

2  not Bryan, then to the Carswell facility.  And if not Carswell,

3  then the Dublin facility.  I strongly recommend the Defendant

4  participate in the Bureau of Prisons' 500 hour drug and alcohol

5  treatment program.  I also strongly recommend that the Bureau

6  of Prisons allow the Defendant to participate in any high

7  school or GED classes so she can earn a high school diploma or

8  GED, and I recommend that she be allowed to participate in

9  additional classes regarding parenting, psychology, and also

10  classes in accounting, if they're available, because that is a

11  career area the Defendant wants to work in.

12          Regarding the terms of supervised release, the

13  Defendant is placed on supervised release for a term of three

14  years as to Count 1, and five years as to Count 2, concurrent,

15  for a total term of supervised release of five years.  The

16  Defendant must comply with mandatory and standard conditions of

17  supervision.  The following special conditions will be imposed.

18          The Defendant must, during the term of supervised

19  release, she must complete 50 hours of community service.  The

20  Defendant may choose the form of community service, but

21  whatever community service she chooses must be approved by the

22  Probation Officer, and she must provide written verification of

23  the completed community service.

24          The Defendant must participate in an outpatient

25  substance abuse treatment program and follow the rules and

1  regulations of the program.  Since the Probation Office must

2  supervise the Defendant's participation in outpatient substance

3  abuse treatment, the Defendant must sign the necessary

4  paperwork to allow the treatment provider to release treatment

5  information to the Probation Office.  The Probation Officer may

6  disclose the Presentence Report and any previous substance

7  abuse or psychological evaluations to the treatment provider.

8       The Defendant is subject to substance abuse testing

9  to determine if she's used any prohibited substances.  Testing

10  shall not exceed more than sixty tests per year, and she cannot

11  tamper with or obstruct any of the testing methods.

12       While under supervised release, the Defendant must

13  submit to a search of her person, property, residence,

14  vehicles, papers, computers, and any electronic communication

15  or data storage devices under her control.  The Probation

16  Officer may conduct a search under this condition only when

17  reasonable suspicion exists, and any search must be done in a

18  reasonable manner and at a reasonable time for the purpose of

19  ensuring compliance with her conditions and to make sure she's

20  not possessing any alcohol, illegal substances, weapons, or

21  other types of contraband.  The Defendant must inform any

22  residents where she's residing that the premises may be subject

23  to a search.

24       The Defendant must not use or possess alcohol.  She

25  may be subject to alcohol testing, and if alcohol testing is

1    employed, then testing shall not exceed more than four tests

2    per day.  The Defendant cannot tamper with or interfere with

3    any of the alcohol testing methods or procedures.  The

4    Defendant must not knowingly purchase, possess, distribute,

5    administer, or otherwise use any psychoactive substances that

6    impair her physical or mental functioning.  These conditions

7    are all imposed based on the Defendant's history of substance

8    abuse, including abuse of alcohol, marijuana and

9    methamphetamine.

10            The Defendant must participate in a mental health

11   treatment program and follow the rules and regulations of that

12   program.  Since the Probation Office must supervise the

13   Defendant's participation in mental health treatment, the

14   Defendant must sign the necessary paperwork to allow the

15   treatment provider to release treatment records to the

16   Probation Office.  The Probation Officer may disclose the

17   Presentence Report and any other mental health evaluations and

18   other treatment records to the treatment provider.  The

19   Defendant must take all mental health medications that are

20   prescribed by her treating physician.  These conditions are

21   imposed based on the mental health issues, including depression

22   and anxiety, which were identified in the Presentence Report.

23            The Defendant must not communicate or otherwise

24   interact with members of the victim's family, either directly

25   or through someone else, without prior approval of the

1  Probation Office.  This condition is imposed because the

2  victim's family is still living at the residence where this

3  offense occurred, and the victim's family are still suffering a

4  lot of trauma from this event.

5          The Defendant must participate in an educational or

6  vocational services program and follow the rules and

7  regulations of the program.  In the event the Defendant does

8  not complete her GED or high school diploma while in the

9  custody of the Bureau of Prisons, then this condition will

10  assist the Defendant in obtaining a GED and furthering her

11  education, which will ultimately improve her employability.

12          I neglected to ask, are there disputes over the

13  restitution amounts?

14          MS. RIVAS:  No, Your Honor.

15          THE COURT:  All right.  The Mandatory Victims

16  Restitution Act is applicable in this case.  Therefore, I am

17  required to order restitution.  Restitution will be made in the

18  amount of $1,628.90 to the victims, and $6,000 to the Crime

19  Victim Reparation Commission.  Restitution shall be submitted

20  to the Clerk of the Court at the address here for this

21  courthouse.  Restitution will be paid in full or in monthly

22  installments of $50, or ten percent of the Defendant's income,

23  whichever is greater.  No fine will be imposed, because in my

24  view restitution is more important than the Government

25  collecting a fine.

1          Consistent with the stipulation in the plea

2    agreement, the Defendant forfeits her rights, title and

3    interest to the Bushmaster AR-15 rifle and the 5.56-millimeter

4    Winchester ammunition.

5          Under the law, I'm required to impose a special

6    penalty assessment of $100 as to each count of conviction, for

7    a total penalty assessment of $200, and I'm required to state

8    that it's due immediately.

9          Now, in terms of the custody portion of the sentence,

10   18 United States Code Section 3553(a) requires the Court to

11   impose a sentence sufficient, but not greater than necessary to

12   comply with the purposes set forth in Paragraph 2 of this

13   subsection, which are the goals of sentencing.  The statute

14   says:  "The Court, in determining the particular sentence to be

15   imposed, shall consider the nature and circumstances of the

16   offense, and the history and characteristics of the Defendant."

17   The next paragraph says, "The need for the sentence imposed A)

18   to reflect the seriousness of the offense, to promote respect

19   for the law, and to provide just punishment for the offense."

20          Subfactor B is to afford adequate deterrence to

21   criminal conduct.  That's not only a specific deterrence

22   relating to the Defendant, but there's also the general

23   deterrence aspect of this factor that essentially means that

24   the sentence imposed should deter others from committing

25   similar type sentences.  Subfactor C is to protect the public

1   from further crimes of the Defendant, and Subfactor D is to

2   provide the Defendant with needed educational or vocational

3   training, medical care, or other correctional treatment in the

4   most effective manner.

5           Regarding Subfactor D, I've made the recommendations

6   regarding education and allowing the Defendant to participate

7   in that, as well as the 500 hour drug and alcohol treatment

8   program.

9           And then also, there's a factor, Number 6, that says,

10  "The need to avoid unwarranted sentence disparities among

11  defendants with similar records who have been found guilty of

12  similar conduct."  In other words, treat similarly situated

13  defendants the same as much as possible.  The guideline

14  sentence generally satisfies that factor, but that factor is

15  not necessarily carved in stone.  Otherwise, there could never

16  be a departure or a variance.

17          Now, in terms of the history and characteristics of

18  the Defendant, in reviewing this Presentence Report, the

19  Defendant does have a lot of trauma and abuse that she

20  experienced as a child.  I don't doubt that at all.  In terms

21  of her adult convictions, beginning in Paragraph 48 when she

22  was 19, there's a series of tribal court convictions which

23  don't create any criminal history points, but these are the

24  type of convictions -- a child not properly restrained, for

25  example, and endangering the welfare of a minor.  That's

1  Paragraph 49.

2         Paragraph 50, unlawful use of a weapon.  There was an

3  arrest for that in tribal court.  Again, there's another

4  conviction in tribal court for -- it would appear that her

5  children were not properly restrained when she was operating a

6  motor vehicle.  That's Paragraph 51.  Paragraph 52, same type

7  of offense, infant child passenger restraints.

8         Paragraph 53, now this conviction came out of the

9  Eleventh Judicial District Court in Aztec, New Mexico.  The

10  conviction was abandonment of a child.  She received 364 days

11  custody, all suspended except for 16 days, time served.  In

12  reading the narrative, officers were dispatched to a motel in

13  reference to two small children, ages 1 and 2, wandering around

14  the parking lot unattended.  The children were only in diapers

15  and it was unknown which room they were residing in.  It goes

16  on to state that information was received indicating the

17  children had entered Room 14 earlier that day, so the officers

18  went to that room and knocked loudly on the door.  When no one

19  answered, a master key was used to enter the room and the

20  Defendant and a male were both found intoxicated and passed

21  out.  So as a result of this, the charge of abandonment of a

22  child was filed.

23         And then in Paragraph 54, the Defendant picks up a

24  conviction for driving while under the influence of liquor and

25  drugs, and in Paragraph 55, in 2014, she gets an aggravated

1   driving while under the influence conviction.  She was also

2   charged with abandonment of a child in that offense, and that

3   proceeded in Gallup.

4         I mention this because one of the factors that I'm

5   concerned about is to protect the public from further crimes of

6   the Defendant.  I understand the Defendant is dealing with

7   significant substance abuse issues, but there's not been any

8   indication that she's been able to overcome her substance

9   abuse.  I have imposed some conditions of supervision for

10   treatment, and hopefully she can overcome her addictions, but I

11   am concerned.  I think the sentence that I'm going to impose

12   will satisfy the goals of sentencing in terms of protecting the

13   public from further crimes of the Defendant.

14         Also in analyzing that factor, I cannot help but be

15   concerned or find that that factor comes into play based on the

16   conduct that occurred in this case in terms of taking an

17   assault rifle and shooting and killing the victim.  Of course,

18   the Defendant was under, again, I think, under the influence,

19   or had been using drugs and alcohol just prior to the

20   circumstances where the victim was killed.

21         MS. RIVAS:  Your Honor, if I may?

22         THE COURT:  what?

23         MS. RIVAS:  Your Honor, I just want to clarify that

24   49 and 50, 51 and 52, are all the same day; one incident.

25         THE COURT:  All right, I'll note that for the record.

1    Now, the sentence that I'm going to impose will

2 reflect the seriousness of the offense, promote respect for the

3 law, and will provide just punishment for the offense.  In

4 terms of deterrence, a lengthy sentence, given the egregious

5 nature of this crime, a lengthy sentence will satisfy the

6 requirement of affording deterrence to criminal conduct.

7    Now, in terms of the nature and circumstances of the

8 offense, I don't doubt at all what the Defendant stated, that

9 all of this has completely has torn apart her family, but I

10 would note that it's destroyed the victim's family.  And it's

11 obvious that the victim's children still carry a significant

12 amount of trauma, and will probably for the rest of their lives

13 because of circumstances where they witnessed their mother

14 being shot and killed by the Defendant.  This whole situation,

15 the killing of the victim, in my view, is unjustified,

16 senseless, it was intentional and violent, and it resulted in

17 the death of a partner and a mother.  It's also disturbing, at

18 least from the comments from one of the victim's children who

19 was interviewed, that that child indicated that the Defendant

20 had pointed the firearm at her sister, who was a third grader.

21    So the conduct in this was particularly egregious,

22 unjustified and senseless, and therefore I will make the

23 finding that a sentence that is sufficient, but not greater

24 than necessary to satisfy the goals of sentencing, is a

25 commitment to the custody of the Bureau of Prisons for a term

1  of 108 months as to Count 1, and 120 months as to Count 2,

2  consecutive, for a total term of incarceration of 228 months.

3  I've already made the recommendations to the Bureau of Prisons

4  and imposed conditions of supervised release.  So finally, I

5  will find that pursuant to the plea agreement, the Defendant

6  waives the right to appeal the final sentence in this matter.

7           Is there anything else from the United States?

8           MR. ALIBERTI:  I have nothing further, Your Honor.

9           THE COURT:  Anything else, Ms. Rivas?

10          MS. RIVAS:  No, Your Honor.

11          THE COURT:  All right.  We'll be in recess.  Thank

12  you.

13  (Proceedings adjourned at 11:20 A.M.)

14                    *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEW MEXICO

3  _____
                                )
4  UNITED STATES OF AMERICA,     )
                                )
5            Plaintiff,          )
                                )
6        vs.                     )     No. 1:20-CR-00972-WJ
                                )
7  TRUDY MARTINEZ,               )
                                )
8            Defendant.          )
   _____)

9

10        CERTIFICATE OF OFFICIAL COURT REPORTER

11      I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65, Federal

12  Realtime Official Court Reporter, in and for the United States

13  District Court for the District of New Mexico, do hereby

14  certify that pursuant to Section 753, Title 28, United States

15  Code, that the foregoing is a true and correct transcript of

16  the stenographically reported proceedings held in the

17  above-entitled matter on Friday, September 10, 2021, and that

18  the transcript page format is in conformance with the

19  regulations of the Judicial Conference of the United States.

20  Dated this 16th day of October, 2021.

21

22  _____
   MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
23  UNITED STATES COURT REPORTER
   333 Lomas Boulevard, Northwest
24  Albuquerque, New Mexico  87102
   Phone:  (505)348-2334
25  Email:  Mary_Loughran@nmd.uscourts.gov